FOURTH DIVISION
August 17, 2006

Consolidated Nos. 1-05-1337, 1-05-1401


| | | |
|---|---|---|
| PETER J. POLLACHEK, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| THE DEPARTMENT OF PROFESSIONAL | ) | |
| REGULATION, n/k/a The Department of | ) | Honorable |
| Financial and Professional Regulation - Division | ) | William O. Maki |
| of Professional Regulation, | ) | Judge Presiding. |
| | ) | |
| Defendant-Appellant. | ) | |


PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiff  Peter J. Pollachek, C.R.N.A.,[1] filed a complaint seeking to permanently

enjoin the Illinois Department of Professional Regulation, now known as the Illinois

Department of Financial and Professional Regulation-Division of Professional

Regulation (Department), from enforcing section 1305.45(e) of its regulation on

"Delivery of Anesthesia Services by a Certified Registered Nurse Anesthetist."  68 Ill.

Adm. Code § 1305.45(e) (2001) (amended eff. April 26, 2002).  Section 1305.45(e)

---

[1] All plaintiffs in the original complaint, amended complaint and second amended complaint, other

than Pollachek, were either dismissed for lack of standing or voluntarily dismissed prior to trial.

Consolidated Nos. 1-05-1337 and 1-05-1401

imposed a requirement that a CRNA may only provide anesthesia services in a

physician's office if that physician has training and experience in the delivery of

anesthesia services to patients.  Following a trial, the circuit court of Cook County

entered an order permanently enjoining the Department from enforcing section

1305.45(e).  The circuit court also entered an order granting plaintiff's petition for fees

and costs in the amount of $208,081.59.  Both the Department and plaintiff now appeal.

 For the following reasons, we reverse both the circuit court's order enjoining the

enforcement of section 1305.45(e) and  award of fees and costs.


I. Background

The chronology of events leading up to the promulgation of section 1305.45(e) is

not in dispute.  In 1998, the Illinois General Assembly enacted the Nursing and

Advanced Practice Nursing Act (Nursing Act) (225 ILCS 65/1 et seq. (West 2004)),

which provides for the licensure of advanced practice nurses.  In 1999, the Illinois

General Assembly amended the Nursing Act to include section 15-25, concerning

"Certified registered nurse anesthetists."  The amendment was intended to codify then-

existing practices for the delivery of anesthesia services in Illinois.  The statute was

based on a consensus reached by the Illinois Association of Nurse Anesthetists and the

Illinois Society of Anesthesiologists.  The Illinois State Medical Society and the Illinois

Nursing Association also joined in the consensus.   Section 15-25 provides, in pertinent

part:

"(a) A licensed certified registered nurse anesthetist may provide

ˇ2ˇ

anesthesia services pursuant to the order of a licensed physician, licensed dentist, or licensed podiatrist in a licensed hospital, a licensed ambulatory surgical treatment center, or the office of a licensed physician, the office of a licensed dentist, or the office of a licensed podiatrist. For anesthesia services, an anesthesiologist, physician, dentist, or podiatrist shall participate through discussion of and agreement with the anesthesia plan and shall remain physically present and be available on the premises during the delivery of anesthesia services for diagnosis, consultation, and treatment of emergency medical conditions ***.

***

(c) A certified registered nurse anesthetist who provides anesthesia services in a physician office, dental office, or podiatric office shall enter into a written practice agreement with an anesthesiologist or the physician licensed to practice medicine in all its branches, the dentist, or the podiatrist performing the procedure. The agreement shall describe the working relationship of the certified registered nurse anesthetist and anesthesiologist, physician, dentist, or podiatrist and shall authorize the categories of care, treatment, or procedures to be performed by the certified registered nurse anesthetist. In a dentist's office, the certified registered nurse anesthetist may only provide those services the dentist is authorized to provide pursuant to the Illinois Dental Practice Act and rules. In a podiatrist's office, the certified registered nurse anesthetist may only

provide those services the podiatrist is authorized to provide pursuant to the Podiatric Medical Practice Act of 1987 and rules. For anesthesia services, an anesthesiologist, physician, dentist, or podiatrist shall participate through discussion of and agreement with the anesthesia plan and shall remain physically present and be available on the premises during the delivery of anesthesia services for diagnosis, consultation, and treatment of emergency medical conditions."  225 ILCS 65/15-25(a), (c) (West 2004).

The Nursing Act created the Advanced Practice Nursing Board (APN Board), to act as an advisory board to the Department regarding regulations promulgated under the Nursing Act.   The APN Board is appointed by the Governor and consists of four advanced practice nurses, three physicians, and two members of the public.  The Nursing Act also provides that the APN Board is to "review and make recommendations to the Department regarding matters relating to licensure and discipline of advanced practice nurses."  225 ILCS 65/15-35(a) (West 2004).

Following the passage of section 15-25 of the Nursing Act, the Department drafted regulations implementing the statute.  The Department conducted several meetings to draft rules,  which were attended by members from the APN Board, Illinois State Medical Society and Illinois Nursing Association .  The proposed rules were published in the Illinois Register on September 22, 2000, and included sections 1305.10 to 1305.95.  24 Ill. Reg. 14159 (September 22, 200).  Part 1305 refers to regulations concerning the advance practice nurse.  As initially proposed, the rule under section

Consolidated Nos. 1-05-1337 and 1-05-1401

1305.45 did not include a training requirement for physicians who work with CRNAs in an office setting. At that time, section 1305.45(e) was directed at CRNAs who practice in a dentist's office or a podiatrist's office. The initial publication in the Illinois Register began the "First Notice Period," which is a 45-day period in which interested persons can comment on proposed rules. During this period, the Department received between 20 to30 comments including two comments from the Illinois State Medical Society regarding whether its members were sufficiently trained to execute the provisions of the Nursing Act.

In December 2000, the Department considered the comments from the Illinois State Medical Society. The ISMS was specifically concerned with the level of anesthesia training possessed by physicians, dentists, and podiatrists working with CRNAs. In response to the ISMS's concerns, the Department proposed a one-time, 2,200-hour training requirement in deep sedation, general anesthesia or regional anesthesia and 60 hours of training in conscious sedation. The Department subsequently received an objection from the Joint Committee on Administrative Rules (JCAR) because it believed that substantial changes had been made to the rules without allowing for public comments.

On March 15, 2001, the Department amended and adopted the proposed rules. The adopted rules added a new section 1305.45(e) and moved the rules relating to CRNA services in dentist and podiatrist offices to sections 1305.45(f) and (g), respectively. The new section 1305.45(e) provided:

"e) In a physician's office, the [CRNA] may only provide anesthesia

services if the physician has training and experience in the delivery of anesthesia services to patients. Such training and experience shall be documented in the written practice agreement.

    1) The training and experience requirements may be met in the manner specified in either subsection (e)(1)(A) or (B):

        A) The physician maintains clinical privileges to administer anesthesia services in a hospital licensed in accordance with the Hospital Licensing Act or an ambulatory surgical treatment center licensed in accordance with the Ambulatory Surgical Treatment Center Act (210 ILCS 5); or

        B) Completion of continuing medical education:

            i) For conscious sedation only, the physician shall complete a minimum of 8 hours of continuing medical education (CME) within each 3 year license renewal period in delivery of anesthesia, including the administration of conscious sedation. The physician will be required to complete 4 to 8 hours of CME for the July 2002 renewal period.

ii) For deep sedation, regional anesthesia and/or general anesthesia, a physician shall complete a minimum of 34 hours of continuing medical education in the delivery of anesthesia services within each 3 year license renewal period. The physician will be required to complete 16 of the 34 hours of CME for the July 2002 renewal period. Fulfillment of this requirement shall satisfy the requirement of subsection (e)(1)(B)(i) above.

iii) A continuing medical education program shall be conducted by a university, professional association, or hospital as a formal CME program under 68 Ill. Adm. Code 1285.110(b)(2)." 68 Ill. Adm. Code § 1305.45(e) (2001) (amended eff. April 26, 2002).

In July 2001, plaintiff, who is licensed as a CRNA, filed an amended complaint for injunctive relief, challenging the validity of section 1305.45(e). Specifically, plaintiff alleged in Count I that section 1305.45(e) exceeded the scope of the Nursing Act and that the Department acted arbitrarily and capriciously in enacting this regulation, and stated in count II that the Department's failure to publish the amended rules for public

Consolidated Nos. 1-05-1337 and 1-05-1401

comment violated the Illinois Administrative Procedure Act (5 ILCS 100/1-1 et seq.

(West 2002)).  In subsequent pleadings,

plaintiff noted that section 1305.45(e), as written, required a physician to obtain the

additional anesthesia training and experience if the physician engaged a CRNA to

perform anesthesia services in an office setting, but that section did not require a

physician to obtain the additional anesthesia training and experience if the physician

performed the anesthesia services himself or herself in an office setting.  Plaintiff

argued that this inconsistency demonstrated that the statute was arbitrary and

capricious.  Plaintiff and the Department subsequently filed cross-motions for summary

judgment on the issue of whether section 1305.45(e) was invalid and unenforceable.

On May 24, 2002, the circuit court denied both motions, finding genuine issues of

material fact remained.

After plaintiff's amended complaint was filed, the Department amended section

1305.45(e), effective April 26, 2003, by moving the physician continuing-medical-

education requirements  from the Nursing Act regulations to the regulations concerning

the Medical Practice Act of 1987 (Medical Practice Act) (225 ILCS 6011 et seq.).  68 Ill.

Adm. Code §§ 1305.45(e),  1285.340 (Conway Greene CD-ROM 2002).  The

Department also changed the physician continuing-medical-education requirements to

include a physician who performs the anesthesia services himself or herself.  As

amended, section 1305.45(e), which remained in the Nursing Act regulations, provided:

"e) In a physician's office, the certified registered nurse anesthetist

may only provide anesthesia services if the physician has training and

experience in the delivery of anesthesia services to patients. The physician's training and experience shall be documented in the written practice agreement and the training and experience shall meet the requirements set forth in 68 Ill. Adm. Code 1285.340."  68 Ill. Adm. Code § 1305.45(e) (Conway Greene CD-ROM 2003).

Additionally, section 1285.340 of the regulations interpreting the Medical Practice Act stated in relevant part:

"a) In a physician's office, the operating physician shall have training and experience in the delivery of anesthesia services in order to administer anesthesia or to enter into a practice agreement with a certified registered nurse anesthetist (CRNA) to provide anesthesia services in the office pursuant to Section 54.5 of the Medical Practice Act and Section 15-25 of the Nursing and the Advanced Practice Nursing Act [225 ILCS 65]. When an anesthesiologist is administering anesthesia in a physician's office, the operating physician is not required to have the training and experience set forth in subsection (b)."  68 Ill. Adm. Code § 1285.340(a) (Conway Greene CD-ROM 2003).

Subsection b, which contains the training and experience requirements for physicians, remains substantially the same as in the original version of section 1305.45(e), except that the date for compliance with this provision was changed to July 31, 2003.

On June 5, 2002, the Department moved to dismiss plaintiff's amended complaint pursuant to section 2-619(a)(9) of the Illinois Code of Civil Procedure (735 ILCS 5/2-

619(a) (9) (West 2002)), contending that because it amended section 1305.45(e) and moved the physician training requirements to the regulations interpreting the Medical Practice Act, plaintiff's arguments were moot.  On August 9, 2002, the circuit court granted the Department's motion to dismiss, finding that plaintiff's complaint had been mooted by the passage of the new regulations.  On appeal, this court reversed the decision of the circuit court granting the Department's section 2-619 motion to dismiss.[2]  This court noted that the current versions of the regulations, located in both section 1305.45(e) and section 1285.340, continue to provide that physicians must have training and experience in the delivery of anesthesia before CRNAs can  work in their offices.  Therefore, without addressing the merits of plaintiff's claims,  this court found that the issue of whether section 1305.45(e) exceeds the scope of the Nursing Act and is inconsistent with the Nursing Act's legislative intent remained viable and was not moot.

Upon remand to the circuit court, plaintiff filed a second amended complaint for injunctive relief, asserting that section 1305.45(e) of the Nursing Act rules is inconsistent with and beyond the scope of the Nursing Act and that the Department acted arbitrarily and capriciously in promulgating the rule.[3]  Plaintiff also requested attorney's fees and

---

[2] See Nuellen v. Department of Professional Regulation, No. 1-02-2794 (July 31, 2003) (unpublished order pursuant to Supreme Court Rule 23).

[3]  Plaintiff's second amended complaint also asserted that section 1305.45(i) of the Nursing Act rules (68 Ill. Adm. Code §1305.45(I) (Conway Greene CD-ROM 2003) ) was invalid

Consolidated Nos. 1-05-1337 and 1-05-1401

costs pursuant to section 10-55 of the Illinois Administrative Procedure Act (5 ILCS 100/10-55 (West 2002)).

From August 30, 2004, until September 2, 2004, the circuit court conducted a trial in this matter. Plaintiff called six witnesses to testify. Bonnie Robertson testified that she was a CRNA and served as the executive director of the Illinois Association of Nurse Anesthetists (IANA). IANA is a professional association that has been in existence since 1939 and represents approximately 1,000 nurse anesthetists in Illinois. Robertson testified as to the training and education requirements for certification as a nurse anesthetist and also testified to the chronology of the statutory enactments at

---

because it imposed an "active participation" requirement on physicians who work with CRNAs. However, on December 10, 2003, the circuit court entered an order striking all relief sought regarding section 1305.45(i). Plaintiff has not filed a cross-appeal raising this issue. Therefore, it is waived. In re Marriage of Gibson-Terry, 325 Ill. App. 3d 317, 324 (2001).

Consolidated Nos. 1-05-1337 and 1-05-1401

issue in this case.

Robertson testified that the Nursing Act was amended in 1999 to codify the existing practices in Illinois concerning the delivery of anesthesia care. Robertson testified that for over 100 years prior to the enactment of section 1305.45(e), CRNAs practiced in Illinois without a scope-of-practice limitation on their ability to administer anesthesia in an office setting.

Leonard Sherman, former Director of the Department, testified that his position was to formulate rules and regulations necessary to enforce the Nursing Act. Sherman testified that the statute strongly suggested some training for physicians because the Nursing Act places responsibility on physicians to put a written collaborative agreement together with CRNAs.

Plaintiff testified that he has been a CRNA since 1989 and owns Stat Anesthesia, a business that has provided outpatient anesthesia services for ambulatory surgical treatment centers and doctor's offices for 15 years. At the time of trial, plaintiff also served as president of the Illinois Association of Nurse Anesthetists. Plaintiff testified regarding the training and educational requirements to become a CRNA in Illinois. Plaintiff explained that to qualify for a nurse anesthesia residency, one must first obtain a bachelor of science degree in nursing and complete one year of experience in an acute care area, such as in an intensive care unit or an emergency room. A CRNA candidate then must complete about a 34-month residency program, which includes both academic and clinical aspects. Plaintiff testified that CRNAs are required to complete 50 hours of continuing medical education every two years.

Plaintiff also testified that CRNAs provide anesthesia services with a physician licensed to practice medicine in all of its branches, during procedures approved for the office setting. Plaintiff provided examples of potential adverse reactions to anesthesia and testified that CRNAs handle situations that arise during the delivery of anesthesia. Plaintiff also testified that there have been constant changes in the field of anesthesiology, including new medications and advances in equipment. Plaintiff testified that anesthesia has become one of the safest specialties due to the advances in equipment.

Plaintiff further testified that the regulation at issue has cost him business, clients, CRNAs and additional expenses. Plaintiff testified that he has incurred the additional expense of having to hire anesthesiologists and physicians where surgeons do not want to obtain the additional anesthesia training in order to work with a CRNA. Plaintiff also testified that his revenues have continued to increase every year.

Mitchell Tobin, plaintiff's expert witness, testified that no other state has an anesthesia training requirement for doctors. Tobin testified that New Jersey has training requirements for physicians who work with nurse anesthetists, but that state's requirements are also in litigation. Tobin also testified that Ohio has a regulation that requires physicians who work with either CRNAs or anesthesiologists to have certain continuing medical education in anesthesia to deliver anesthesia care in office settings.

John A. Greager, M.D., testified that he is a surgical oncologist employed at Stroger Cook County Memorial Hospital and has an office-based surgical practice. Dr. Greager has contracted with Stat Anesthesia for two years. Dr. Greager testified that

he uses CRNAs and anesthesiologists to deliver anesthesia services in his office practice. Dr. Greager testified that he preferred to hire CRNAs based on their bedside manner with patients and the costs involved. He also testified that while he has continued to use CRNAs, the regulation has affected his office practice because he could not take the additional CME requirements due to time constraints and his need to take continuing medical education for his own specialty. Dr. Greager further testified that the training requirements were redundant because surgical physician residents do a rotation in anesthesiology during which they do everything that an anesthesiologist does. Dr. Greager testified that he and his team, which includes both CRNAs and anesthesiologists, can adequately handle emergencies as they arise in the office setting.

Michael Pine, M.D., testified regarding data he studied of nurse anesthetists working in a hospital setting. He limited his study to eight high-volume, elective procedures. According to Dr. Pine's study, there was no statistical difference in outcomes between CRNAs, anesthesiologists, and CRNAs working with anesthesiologists.

The Department called three witnesses to testify: Leonard Sherman, Jean Courtney, and Kenneth Tuman, M.D. Director Sherman testified again as to the regulation-making process and as to the difference between a CRNA and an anesthesiologist.

Jean Courtney, rules coordinator for the Department, testified that the APN Board advises the Department on matters involving rules and any problems that would

come before the APN Board. Courtney testified that the APN Board put together a working draft of section 1305.45. Courtney also testified that the APN Board meetings are open to the public and that the Director gives final approval of a proposed regulation. Courtney testified that the Director looked for guidance on the physician anesthesia experience and education requirements in the Dental Practice Act and that the training hours were significantly reduced from those hours found in the Dental Practice Act.

Kenneth Tuman, M.D., an anesthesiologist at Rush Hospital, testified that an anesthesiologist and a nurse anesthesiologist have separate and distinct training programs. The practice of anesthesiology is a medical specialty and takes four years of training. CRNAs have a bachelor's degree in nursing, one year of experience, and then complete a 24- to 30-month program. Dr. Tuman testified that for the past decade, anesthesiology has been an elective for medical students but that medical students do receive informal training in anesthesiology during surgery rotations. Dr. Tuman also testified that most medical schools have lectures on anesthetic drugs and local anesthetics as part of a general pharmacology course. Dr. Tuman explained that anesthesia affects heart rate, blood pressure and breathing. Inherent risks in anesthesia include airway complications and cardiovascular complications. Dr. Tuman testified that there have been changes and advances in anesthesiology involving procedures, medications and equipment.

Dr. Tuman also testified that an office setting is not as safe as a hospital setting and that requiring continuing medical education for physicians in anesthesiology would

have no effect on health-care costs.  In Dr. Tuman's opinion, the risk of injury or death to patients is higher when anesthesia is delivered in an office setting unless the attending physician has the qualifications necessary to successfully intervene in the event of something going wrong.  Dr. Tuman based his opinion partially on a Florida study conducted by Dr. Villa that identified approximately a ten-fold difference in adverse outcomes in office settings compared to ambulatory surgical treatment centers.  Dr. Tuman also testified that a follow-up study was conducted in 2002 after regulations were enacted, which related to more safety measures in the office setting.  These safety measures included requiring the services of an anesthesiologist in the office setting for the delivery of regional anesthesia, general anesthesia, and deep sedation.  Dr. Tuman testified that the follow-up study showed a significant reduction in mortality rates after the safety regulations were enacted.

After this evidence was presented, the circuit court on October 1, 2004, entered an order permanently enjoining the Department from enforcing section 1305.45(e) of the Nursing Act regulations.  The court found that Title 15 of the Nursing Act, which pertains to advanced practice nurses, "does not expressly provide for the Department to promulgate regulations requiring physicians to undergo additional anesthesia training when they work with nurse anesthetists in an office setting."  The court also found no enabling language in the Nursing Act granting the Department the authority to impose such additional training on licensed physicians.  Therefore, the court concluded that the regulation was not valid as a matter of law, and that it need not evaluate whether section 1305.45(e) is arbitrary and capricious.  The court also found that plaintiff had

established that he was entitled to a permanent injunction where his ability to practice his profession as a CRNA would be irreparably harmed by the enforcement of section 1305.45(e) and where plaintiff had no adequate remedy at law.

The circuit court subsequently denied the Department's motion to reconsider. In doing so, the court noted that while the Department has wide latitude to regulate the nursing profession, nothing in the Nursing Act provides the Department with authority to impose additional anesthesia training on licensed physicians who work with CRNAs in an office setting. On March 23, 2005, the circuit court entered an order granting plaintiff's petition for fees and costs in the amount of $208,081.59, pursuant to the Illinois Administrative Procedure Act (5 ILCS 100/10-55 (West 2002)).

On appeal, the Department contends that the circuit court erred in granting plaintiff a permanent injunction and awarding plaintiff fees and costs. The Department specifically argues that section 1305.45(e) is valid and neither arbitrary nor capricious. The Illinois State Medical Society and the Illinois Society of Anesthesiologists have filed an *amicus curiae* brief in support of the Department's appeal. Plaintiff contends that the circuit court correctly determined that the statute was invalid but erred in awarding him partial fees and costs and seeks an increase in the amount awarded. The American Association of Nurse Anesthetists and the Illinois Association of Nurse Anesthetists have filed an *amicus curiae* brief in support of plaintiff's contention that section 1305.45(e) is invalid and maintain that the restrictions are unnecessary and serve the sole purpose of discouraging surgeons from working with CRNAs.

Consolidated Nos. 1-05-1337 and 1-05-1401

## II. Analysis

### A. Standard of Review

Whether the regulation is invalid as a matter of law is a question to be reviewed by this court <u>de</u> <u>novo</u>.  <u>Department of Revenue v. Civil Service Comm'n</u>, 357 Ill. App. 3d 352, 361 (2005).  In determining whether a challenged regulation is valid, a reviewing court must first determine if the regulation is consistent with the language of the statute.  <u>K Mart Corp. v. Cartier, Inc.</u>, 486 U.S. 281, 291, 100 L. Ed. 2d 313, 324, 108 S. Ct. 1811, 1817-18 (1988).

"In ascertaining the plain meaning of the statute, the court must look to the

particular statutory language at issue, as well as the language and

design of the statute as a whole. [Citations.]  If the statute is silent

or ambiguous with respect to the specific issue addressed by the

regulation, the question becomes whether the

agency regulation is a permissible construction of the statute. [Citations.]  If the

agency regulation is not in conflict with the plain language of the statute, a

reviewing court must give deference to the agency's interpretation of the statute.

[citation omitted.]"  <u>K Mart Corp.</u>, 486 U.S. at 291-92, 1000 L. Ed. 2d at 324, S.

Ct. at 1817-18.

If the agency regulation is not in conflict with the plain language of the statute, then this court should consider whether the Department's decision to require CRNAs in an office setting to work with physicians who have additional anesthesia training, pursuant to section 1305.45(e), is arbitrary and capricious.

˘18˘

"Courts have generally recognized three levels of scrutiny, or standards of review, which can be used in the evaluation of an administrative action. In rare instances, an agency action may be subject to de novo review, in which little or no deference is given to agency judgment. [Citation.] In other instances, an administrative action will be set aside if it is not supported by 'substantial evidence' or if it runs counter to the 'manifest weight of the evidence.' [Citation.] Lastly, agency action can be set aside if the agency exercises its discretion in an 'arbitrary or capricious manner.' [Citation.] This last, and least demanding, standard of review is often equated with "abuse of discretion." Greer v. Illinois Housing Development Authority, 122 Ill. 2d 462, 496-97 (1988).

An agency acts arbitrarily and capriciously if its decision: (1) relies on factors that the legislature did not intend for the agency to consider; (2) fails to consider an important aspect of the problem; or (3) offers an explanation for its decision that runs counter to the evidence before the agency. Greer, 122 Ill. 2d at 505-06.

## B. Validity of Section 1305.45(e)

On appeal, the Department first contends that the circuit court erred by finding that section 1305.45(e) was invalid where the Department had the authority to enact the regulation pursuant to the Nursing Act. The Department argues that the circuit court failed to recognize that the continuing-medical-education requirements for physicians who work with CRNAs in an office setting are contained in the rules under the Medical

Consolidated Nos. 1-05-1337 and 1-05-1401

Practice Act, not the Nursing Act rules, and that section 1305.45(e) merely cross-references the education requirements contained in the Medical Practice Act.  We agree.

The amended version of section 1305.45(e), which remains located in the regulations interpreting the Nursing Act, provides that "[i]n a physician's office the [CRNA] may only provide anesthesia services if the physician has training and experience in the delivery of anesthesia services to patients" and that the "training and experience shall be documented in the written practice agreement and *** meet the requirements set forth in 68 Ill. Adm. Code 1285.340."  68 Ill. Adm. Code § 1305.45(e) (Conway Greene CD-ROM 2003).  Accordingly, section 1305.45(e) sets forth the circumstances under which a CRNA may provide anesthesia services in a physician's office.  The training and experience requirements for physicians who work with CRNAs in an office setting are located in the regulations interpreting the Medical Practice Act, and plaintiff has not challenged the Department's authority to adopt such rules under the Medical Practice Act.  These rules require physicians who work in an office to have additional training and experience "in order to administer anesthesia or to enter into a practice agreement with a [CRNA]."  68 Ill. Adm. Code § 1285.340(a) (Conway Greene CD-ROM 2003).  Therefore, the training and experience requirements apply both to physicians who work on their own and to physicians who work with CRNAs, and the Medical Practice Act regulation does not single out CRNAs in a manner to discourage physicians from working with them.  Section 1305.45(e) of the Nursing Act rules merely cross-references these training and experience requirements under the Medical

Consolidated Nos. 1-05-1337 and 1-05-1401

Practice Act, and the Department's use of cross-referencing is not an uncommon practice. See Illinois Central Gulf R.R.Co. v. Department of Local Government Affairs, 95 Ill. 2d 111, 140 (1983).

We first evaluate whether section 1305.45(e) is inconsistent with the plain language of the Nursing Act. To do so requires us to provide a lengthy recitation of several provisions of the Act. The Nursing Act is divided into four titles: Title 5. General Provisions; Title 10. Registered Nurses and Licensed Practical Nurses; Title 15. Advanced Practice Nurses; and Title 20. Administration and Enforcement. The purpose of the Nursing Act is found in section 5-5, which provides:

> "§5-5. Legislative purpose. The practice of professional and practical nursing in the State of Illinois is hereby declared to affect the public health, safety, and welfare and to be subject to regulation and control in the public interest. It is further declared to be a matter of public interest and concern that the practice of nursing, as defined in this Act, merit and receive the confidence of the public and that only qualified persons be authorized to so practice in the State of Illinois. This Act shall be liberally construed to best carry out these subjects and purposes." 225 ILCS 65/5-5 (West 2002).

Title 15 contains statutes enacted regarding "Advanced Practice Nurses." Section 15-25 provides in pertinent part:

> "§15-25. Certified registered nurse anesthetists.
>
> (a) A licensed certified registered nurse anesthetist may provide

˘21˘

anesthesia services pursuant to the order of a licensed physician, licensed dentist, or licensed podiatrist in a licensed hospital, a licensed ambulatory surgical treatment center, or the office of a licensed physician, the office of a licensed dentist, or the office of a licensed podiatrist. For anesthesia services, an anesthesiologist, physician, dentist, or podiatrist shall participate through discussion of and agreement with the anesthesia plan and shall remain physically present and be available on the premises during the delivery of anesthesia services for diagnosis, consultation, and treatment of emergency medical conditions, unless hospital policy adopted pursuant to clause (B) of subdivision (3) of Section 10.7 of the Hospital Licensing Act [210 ILCS 85/10.7 (West 2002)] or ambulatory surgical treatment center policy adopted pursuant to clause (B) of subdivision (3) of Section 6.5 of the Ambulatory Surgical Treatment Center Act [210 ILCS 5/6.5 (West 2002)] provides otherwise.

***

(c) A certified registered nurse anesthetist who provides anesthesia services in a physician office, dental office, or podiatric office shall enter into a written practice agreement with an anesthesiologist or the physician licensed to practice medicine in all its branches, the dentist, or the podiatrist performing the procedure. The agreement shall describe the working relationship of the certified registered nurse anesthetist and anesthesiologist, physician, dentist, or podiatrist and shall authorize the

categories of care, treatment, or procedures to be performed by the certified registered nurse anesthetist. In a dentist's office, the certified registered nurse anesthetist may only provide those services the dentist is authorized to provide pursuant to the Illinois Dental Practice Act [225 ILCS 25/1 et seq. (West 2002)] and rules. In a podiatrist's office, the certified registered nurse anesthetist may only provide those services the podiatrist is authorized to provide pursuant to the Podiatric Medical Practice Act of 1987 [225 ILCS 100/1 et seq. (West 2002)] and rules. For anesthesia services, an anesthesiologist, physician, dentist, or podiatrist shall participate through discussion of and agreement with the anesthesia plan and shall remain physically present and be available on the premises during the delivery of anesthesia services for diagnosis, consultation, and treatment of emergency medical conditions." 225 ILCS 65/15-25 (a), (c) (West 2002).

Title 15 defines a "Physician" as a "person licensed to practice medicine in all its branches under the Medical Practice Act of 1987." 225 ILCS 65/15-5 (West 2002). Section 15-15 of the Nursing Act describes the written collaborative agreement a CRNA must have with a collaborating physician in order to practice in an office setting:

"(b) A written collaborative agreement shall describe the working relationship of the advanced practice nurse with the collaborating physician and shall authorize the categories of care, treatment, or procedures to be performed by the advanced practice nurse. ***

Collaboration means the relationship under which an advanced practice nurse works with a collaborating physician in an active clinical practice to deliver health care services in accordance with (i) the advanced practice nurse's training, education, and experience and (ii) medical direction as documented in a jointly developed written collaborative agreement. The agreement shall be defined to promote the exercise of professional judgment by the advanced practice nurse commensurate with his or her education and experience.  The services to be provided by the advanced practice nurse shall be services that the collaborating physician generally provides to his or her patients in the normal course of his or her clinical medical practice.  The agreement need not describe the exact steps that an advanced practice nurse must take with respect to each specific condition, disease, or symptom but must specify which authorized procedures require a physician's presence as the procedures are being performed.  The collaborative relationship under an agreement shall not be construed to require the personal presence of a physician at all times at the place where services are rendered.  Methods of communication shall be available for consultation with the collaborating physician in person or by telecommunications in accordance with established written guidelines as set forth in the written agreement.

   (c) Physician medical direction under an agreement shall be adequate if a collaborating physician:

(1) participates in the joint formulation and joint approval of orders or guidelines with the APN and he or she periodically reviews such orders and the services provided patients under such orders in accordance with accepted standards of medical practice and advanced practice nursing practice;

(2) is on site at least once a month to provide medical direction and consultation; and

(3) is available through telecommunications for consultation on medical problems, complication, or emergencies or patient referral."  225 ILCS 65/15-15 (b), (c) (West 2002).

Section 10-10 of the Nursing Act, entitled "Registered Nurses and Licensed Practical Nurses," provides in part:

"(a) The Department shall exercise the powers and duties prescribed by the Civil   Administrative Code of Illinois [20 ILCS 5/1 et seq. (West 2002)] for administration of licensing acts and shall exercise other powers and duties necessary for effectuating the purpose of this Act. None of the functions, powers, or duties of the Department with respect to licensure and examination shall be exercised by the Department except upon review by the Board.  The Department shall adopt rules to implement, interpret, or make specific the provisions and purposes of this Act; however no such rules shall be adopted by the Department except upon review by the Board."  225 ILCS 65/10-10(a) (West 2002).

Consolidated Nos. 1-05-1337 and 1-05-1401

It is well settled that the primary objective of this court when construing the meaning of a statute is to ascertain and give effect to the legislature's intent. In determining legislative intent, our inquiry begins with the plain language of the statute, which is the most reliable indication of the legislature's objectives in enacting a particular law. A fundamental principle of statutory construction is to view all provisions of a statutory enactment as a whole. To do so, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute. Southern Illinoisan v. Illinois Dept. of Public Health, 218 Ill. 2d 390, 415 (2006).

Section 10-10 of the Nursing Act expressly states that the Department has the authority to promulgate rules "to implement, interpret, or make specific the provisions and purposes of *this Act.*" (Emphasis added.) 225 ILCS 65/10-10(a) (West 2002). Despite this specific language, the circuit court apparently determined that the Department lacked authority to adopt section 1305.45(e) based on its finding that this enabling language is contained in Title 10 pertaining to "Registered Nurses and Licensed Practical Nurses," rather than Title 15 pertaining to "Advanced Practice Nurses." However, Title 15 defines an "advanced practice nurse," such as a CRNA, as a person who, among other things, "is licensed as a registered professional nurse under this Act." 225 ILCS 65/15-5 (West 2002). The general provisions under Title 5 of the Nursing Act also provide that " 'registered professional nursing practice' includes all nursing specialties." 225 ILCS 65/5-10(l) (West 2002). An advanced practice nurse is therefore a registered and licensed nurse under the Nursing Act, and it is immaterial

Consolidated Nos. 1-05-1337 and 1-05-1401

that such authority for the Department to promulgate rules is set forth in Title 10 pertaining to "Registered Nurses and Licensed Practical Nurses," rather than Title 15 pertaining to "Advanced Practice Nurses."

The Department also argues that section 1305.45(e) implements and is consistent with section 15-25 of the Nursing Act. Plaintiff maintains that section 1305.45(e) is inconsistent with section 15-25 where the Nursing Act places no restriction on the services that a CRNA may provide in a physician's office as long as the physician is licensed to practice medicine in all of its branches and a written practice agreement is entered into.

Section 15-25(a) of the Nursing Act specifically provides that "[a] licensed [CRNA] may provide anesthesia services pursuant to the order of a licensed physician *** in *** the office of a licensed physician" and that a physician "shall participate through discussion of and agreement with the anesthesia plan and shall remain physically present and be available on the premises during the delivery of anesthesia services for diagnosis, consultation, and treatment of emergency medical conditions." 225 ILCS 65/15-25(a) (West 2002). The requirements of section 15-25(c), applicable to CRNAs, are identical to those of section 15-25(a) with the additional requirement that the CRNA and the physician must have a "written practice agreement." 225 ILCS 65/15-25(c) (West 2002).

Accordingly, the plain language of section 15-25 evinces the legislature's intent that a CRNA who provides anesthesia services in a physician's office, work closely with

˘27˘

the physician in administering such anesthesia services. Section 15-25 requires that the physician must confer with the CRNA, agree to an anesthesia plan, and remain physically present and available to respond to emergency medical conditions. Contrary to plaintiff's contention, the Nursing Act does place restrictions on a CRNA who provides anesthesia services in an office setting by requiring that the CRNA work with physicians who have the capacity to confer with the CRNA and that the CRNA and physician agree to an anesthesia plan. By requiring a CRNA to work only with a physician who has received additional training and experience in the delivery of anesthesia services, as required by section 1285.340(a) of the rules for the Medical Practice Act, section 1305.45(e) of the Nursing Act rules is consistent with section 15-25 of the Nursing Act because it ensures that CRNAs will only work with office-based physicians who have the requisite knowledge to devise a treatment plan and the ability to provide diagnosis, consultation and treatment of emergency medical conditions that may arise during the delivery of anesthesia services.

Plaintiff, nonetheless, argues that section 1305.45(e) is inconsistent with the statute where the Nursing Act limits the services that a CRNA can provide while working in a dentist office or a podiatrist office, but places no similar restriction on the services that a CRNA may provide in a physician's office, as long as the physician is "licensed to practice medicine in all its branches" and the physician and CRNA enter into a "written practice agreement." 225 ILCS 65/15-25(a), (c) (West 2002).

The Nursing Act provides that a CRNA "may only provide those services that the dentist is authorized to provide pursuant to the Illinois Dental Practice Act and rules."

225 ILCS 65/15-25(c) (West 2002). Similarly, the Nursing Act provides that a CRNA "may only provide those services that the podiatrist is authorized to provide pursuant to the Podiatric Medical Practice Act of 1987 and rules." 225 ILCS 65/15-25 (c) (West 2002). Plaintiff argues that the rule of statutory construction *expressio unis est exclusio alterius* ("the expression of one thing is the exclusion of another") should apply in this case where the legislature restricted CRNAs who work in a dentist or podiatric office to services authorized pursuant to the Illinois Dental Practice Act and Podiatric Medical Practice Act, but placed no such restriction on the services that a CRNA may perform while working in a physician's office. However, we find that the this rule of statutory construction is inapplicable in this case where the Nursing Act did place restrictions on CRNAs working in a physician's office by requiring CRNAs to confer with the physician regarding the delivery of anesthesia, enter into a written service agreement, and to only provide anesthesia services when the physician is physically present and available on the premises. 225 ILCS 65/15-25(a), (c) (West 2002).

Accordingly, we find that the agency regulation is not in conflict with the plain language of the statute, and we next consider whether the Department's decision to require CRNAs in an office setting to work with physicians who have additional anesthesia training, pursuant to section 1305.45(e), is arbitrary and capricious.

Plaintiff first contends that the Department's actions were arbitrary and capricious where section 1305.45(e) is facially inconsistent with the Nursing Act, and this inconsistency shows that the Department relied on factors that the legislature did not intend for it to consider. However, as previously discussed, we find that section

1305.45(e) is consistent with the Nursing Act and therefore reject plaintiff's contention.

Plaintiff also asserts that the Department failed to conduct a study and evaluate patient outcomes where a physician works with a CRNA, as opposed to an anesthesiologist, and failed to consider the economic impact that section 1305.45(e) would have on patients and CRNAs. Plaintiff cites no authority in support of his arguments that the Department's regulations must be based on these types of studies or evaluations. In addition, the legislature, rather than the Department, determined that CRNAs and anesthesiologists should be treated differently. Section 54.5(b-5) of the Medical Practice Act (225 ILCS 60/54.5(b-5) (West 2002)) provides that an anesthesiologist or physician "may collaborate with a [CRNA] in accordance with Section 15-25 of the [Nursing Act]." Sections 54.5(b-5) and 54.5(b-10) require for anesthesia services that "the anesthesiologist or physician participates through discussion of and agreement with the anesthesia plan and is physically present and available on the premises during the delivery of anesthesia services for diagnosis, consultation, and treatment of emergency medical conditions" and that "the anesthesiologist or operating physician must agree with the anesthesia plan prior to the delivery of services." 225 ILCS 60/54.5(b-5), (b-10) (West 2002). The Medical Practice Act does not require a physician to discuss and agree to an anesthesia plan when the anesthesia services are administered by an anesthesiologist; rather, those physician duties only apply when the anesthesia services are administered by a CRNA.

In addition, Director Sherman testified that he was concerned with the statutory language and public safety and did not believe it was necessary to consider the

economic impact of the rule or the differences between CRNAs and anesthesiologists. Director Sherman testified that the statute strongly suggested some training for physicians because the Nursing Act places responsibility on physicians to put a written collaborative agreement together. Courtney also testified that the Joint Committee on Administrative Rules did not require the Department to study the economic impact of the rule or the patient outcomes in anesthesia services. We are not persuaded that the Department's regulation is arbitrary or capricious where it is consistent with the purpose of the Nursing Act to protect the health, safety, and welfare of the public. See 225 ILCS 65/5-5 (West 2002). Further, plaintiff has not shown that enforcement of section 1305.45(e) has created an economic hardship. Rather, plaintiff testified that since the regulation was enacted, his business had to utilize more anesthesiologists rather than CRNAs, but that his revenues have continued to increase every year. Dr. Greager also testified that since the regulation was enacted, he has continued to use plaintiff's business and still prefers to work with CRNAs.

Plaintiff lastly argues that the Department offered implausible explanations for promulgating section 1305.45(e) where there where no hearings, data or other information considered prior to the Department adding the new physician anesthesia training requirements. Plaintiff asserts that the Department's addition of extensive training and educational requirements and then reduction of the number of hours of additional training requirements show that the Department's actions were arbitrary and capricious.

The evidence shows that Director Sherman received comments from the ISMS

offering its opinion that the law required the physician to have training and experience in the delivery of services to be provided by the CRNA. The ISMS also noted that "the delivery of anesthesia services is one of the most dangerous areas of medical practice" and "[t]he standards for office based anesthesia delivery are very important for the protection of the public." Director Sherman testified that he considered the opinions of the ISMS and studied the Nursing Act, then determined that a physician training requirement would help ensure that the office-based physician could satisfy the statutorily mandated responsibilities of participating in the anesthesia plan and being available for diagnosis, consultation and treatment of emergencies. Director Sherman testified that ongoing training in anesthesia was an important consideration to ensure that physicians would be properly equipped to provide quality care to patients in the office setting.

At trial, Dr. Tuman also testified that an office setting is not as safe as a hospital setting and that in the absence of qualified personnel in the office setting who have an understanding of how to rescue a patient from the medical complications associated with the delivery of anesthesia, the risk of serious adverse events, in particular death and injury to patients, is higher than if the physician has the necessary qualifications. Dr. Tuman cited a Florida study conducted by Dr. Villa that identified nearly a tenfold difference in adverse outcomes in office settings compared to ambulatory surgical treatment centers. Dr. Tuman also noted that a follow-up study was conducted in 2002 after safety regulations were enacted, which included a requirement that an anesthesiologist deliver regional anesthesia, general anesthesia, and deep sedation in

the office setting. Dr. Tuman testified that the follow-up study showed a significant reduction in mortality rates after the safety regulations were enacted.

Director Sherman testified that he initially proposed a one-time training requirement of 2,200 hours patterned after continuing medical education requirements for dentists. Director Sherman testified that he received objections to this requirement and that he was informed that a physician receives more training in anesthesia prior to licensure than a dentist. Director Sherman testified that, based on this difference, he became convinced that adopting the dental hours was not the best choice. Director Sherman believed the most practical and reasonable way to proceed was to call in interested parties for him to express his concerns regarding the need for physicians to have training and negotiate with the parties. Director Sherman met with a number of individuals from professional groups and the Joint Committee on Administrative Rules, and considered comments from these individuals. The Department's rule was subsequently modified to require fewer continuing medical education hours than originally proposed and to require training on an ongoing basis. Based on this evidence, we cannot say that the Department's actions were arbitrary or capricious where the Department offered plausible explanations for requiring office-based physicians to complete additional training in anesthesia before delivering anesthesia services or working with a CRNA who delivers anesthesia services.

### C. Fees and Costs

In light of our determination that section 1305.45(e) is a valid enactment, it becomes evident that the circuit court also erred in awarding fees and costs since such

Consolidated Nos. 1-05-1337 and 1-05-1401

an award can only be made in the event that the Department's rule is invalidated by the court.  See Stutzke v. Illinois Commerce Comm'n, 242 Ill. App. 3d 315, 319-20 (1993).

Section 10-55 of the Illinois Administrative Procedure Act provides in pertinent part:

"(c) In any case in which a party has any administrative rule invalidated by a court for any reason, including but not limited to the agency's exceeding its statutory authority or the agency's failure to follow statutory procedures in the adoption of the rule, the court shall award the party bringing the action the reasonable expenses of the litigation, including reasonable attorney's fees."  5 ILCS 100/10-55(c) (West 2002).

In this case, for the reasons previously mentioned, we find that the Department had the authority under the Nursing Act to enact section 1305.45(e).  While we note that the Department amended section 1305.45(e) by moving the physician continuing-medical-education requirements from the Nursing Act regulations to the regulations concerning the Medical Practice Act after plaintiff filed his amended complaint, section 10-55 of the Illinois Administrative Procedure Act only provides for fees and costs where the Department's rule is invalidated by the court.  Accordingly, we must vacate the circuit court's order awarding plaintiff fees and costs.

### III.  Conclusion

For the above stated reasons, we reverse the circuit court's order finding section 1305.45(e) invalid and vacate the circuit court's order awarding fees and costs.

Reversed.

Consolidated Nos. 1-05-1337 and 1-05-1401

GREIMAN and MURPHY, JJ., concur.